[Cite as *In re R.W.*, 2025-Ohio-4766.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

IN THE MATTER OF: R.W.,

A NEGLECTED/DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0023**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Columbiana County, Ohio
Case No. J2023-0111-5

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Christopher P. Lacich,* Roth, Blair, for Appellant and

*Atty. Vito Abruzzino*, Columbiana County Prosecutor and *Atty. Danielle Menning* Assistant Prosecuting Attorney, for Appellee.

Dated:  October 16, 2025

**DICKEY, J.**

**{¶1}** Appellant, A.B. ("Mother") appeals the June 10, 2025 judgment entry of the Columbiana County Court of Common Pleas, Juvenile Division, sustaining the motion for permanent custody of R.W. (d.o.b. 5/13/2023) filed by the Columbiana County Department of Job and Family Services ("Agency"). R.P.W. ("Father") was represented by counsel throughout the proceedings but did not appear at the merits hearing conducted on May 20, 2025 and did not appeal the judgment entry terminating his parental rights.

**{¶2}** In Mother's sole assignment of error, she contends the juvenile court committed reversible error because granting custody of R.W. to the Agency was not in R.W.'s best interest, such that the judgment entry was based on legally insufficient evidence and against the manifest weight of the evidence. Finding no reversible error, the June 10, 2025 judgment entry of the juvenile court terminating Mother's parental rights of R.W. is affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶3}** There is no transcript of the merits hearing due to a mechanical failure of the recording equipment. Pursuant to an order of this Court, the parties submitted their respective Appellate Rule 9(C) statements of evidence for the juvenile court's review. Following a hearing on September 5, 2025, the juvenile court issued an approved statement of evidence, amending certain statements submitted by the parties based on the juvenile court's recollection of the testimony at the hearing. In addition, the juvenile court attached its handwritten notes from the merits hearing to the approved statement of evidence. As a consequence, the following facts are taken from the case file, the Appellate Rule 9(C) statements, as amended by the juvenile court, and the approved statement of evidence.

**{¶4}** A voluntary protective intervention was initiated by the Agency on May 15, 2023, two days after R.W.'s birth, as Mother's drug screen returned positive results for amphetamines, methamphetamines, and tetrahydrocannabinol ("THC") prior to delivery. Although R.W.'s urine did not test positive for drugs, a Cord Stat test performed on R.W.'s umbilical cord returned positive results for amphetamines, methamphetamines, and THC.

**{¶5}** At the time of the initial referral and investigation, Mother and Father (collectively "Parents") resided in a home either owned or rented by Father on Anderson Boulevard in East Liverpool, Ohio ("Anderson Boulevard residence"), with no working utilities. Father is a registered sex offender.

**{¶6}** Based on the foregoing facts, the Agency continued to monitor R.W. and Parents after Mother and R.W. were released from the hospital. Over the course of several months, R.W.'s weight continuously declined and a case report establishes the skin on R.W.'s arms and legs was elastic and his eyes were sunken. Suspecting malnutrition, the Agency questioned Mother about her feeding regimen and provided cursory instruction on proper feeding methods.

**{¶7}** During this time, Mother's drug screens continued to return positive results for THC. Father initially refused to submit to drug screens, but later tested positive for amphetamines, methamphetamines, and THC. Agency oversight was discontinued in July after R.W. began gaining weight.

**{¶8}** In early September of the same year, the Agency received reports of domestic abuse and continuing illegal drug use at the Anderson Boulevard residence. Mother was seen shaking R.W. and holding him by one leg, as well as striking R.W. in the mouth with such force that she drew blood.

**{¶9}** Two individuals residing at the Anderson Boulevard residence reported Father was incarcerated due to his failure to make child support payments. Mother had been living at a residence in West Virginia for the previous two weeks and regularly abandoned R.W. for hours, and sometime days at a time, at the Anderson Boulevard residence in the care of others. The couple suspected but could not confirm Mother's use of illegal drugs. (10/19/23 Home Study.)

**{¶10}** An emergency oral motion was made by the Agency and sustained by the juvenile court on September 22, 2023, pursuant to Juvenile Rule 13, placing R.W. in the temporary emergency custody of the Agency. A complaint filed by the Agency that same day alleged R.W. was a neglected and dependent child. Mother conceded to leaving R.W. in the care of others for weeks and claimed R.W. had not been in her care for a month leading up to the filing of the Agency's complaint. An amended complaint was filed on October 23, 2023 alleging R.W. was an abused and dependent child.

{¶11} A woman, D.R., made a third referral to the Agency when Mother abandoned R.W. and left him in D.R.'s care for five days. D.R. reported Mother was abusing illegal drugs and frequently left R.W. in D.R.'s care for days at a time. Mother reportedly left R.W. in the care of known illegal drug abusers as well. C.W., R.W.'s maternal grandmother, telephoned the Agency and reported Mother had "signed custody over," but it had not been processed through the juvenile court.

{¶12} Mother, Father, D.R., C.W., and two friends of Mother attended the probable cause hearing conducted on September 25, 2023. Parents were drug tested prior to the hearing. Mother was negative for all tested substances, while Father tested positive for amphetamines, methamphetamines, and THC.

{¶13} Mother, who warranted she was drug-free prior to the test results, testified she had filed a petition for a temporary restraining order against Father, but would not disclose the incident or incidents precipitating the petition. Mother reported she was living alone in a trailer in West Virginia and waiting for confirmation that she had secured employment. She refused to authorize an Agency visit because she needed additional time to set up the home. The juvenile court entered an order continuing the Agency's temporary emergency custody of R.W.

{¶14} Mother did not pursue the temporary restraining order against Father. However, in the weeks that followed, she accused Father of domestic abuse and claimed another man was R.W.'s biological father, despite Father's identification as R.W.'s father on R.W.'s birth certificate. (11/29/23 Supervisor's Report.)

{¶15} During an unannounced Agency visit at the Anderson Boulevard residence on October 9, 2023, Parents were both present, but they claimed it was the first time they had seen each other since the September 25, 2023 hearing. Mother declared herself drug-free and refused to undergo a drug test. She reported she had applied for a job in West Virginia as a security guard for an oil company.

{¶16} On October 19, 2023, the proposed case plan was provided to Parents. The proposed plan raised six concerns: (1) parents' mental health; (2) the lack of safe, stable, and appropriate housing; (3) parents' lack of parenting skills and use of appropriate parenting practices; (4) parents' drug use; (5) Mother's diminished cognitive

ability and its effect on her ability to independently care for R.W.; and (6) R.W.'s basic needs not being met by a safe and appropriate caregiver.

**{¶17}** The original caseworker assigned by the Agency, identified in the record solely as "Worker Cochran," and Billie Jo Dickson ("Dickson"), the Agency caseworker newly assigned, conducted a meeting with Parents following the supervised visit with R.W. on October 19, 2023. Parents expressed concern about R.W.'s foster home, due to the fact that he was wearing dirty mismatched socks and was losing weight. R.W. also had a thin red mark along the base of his neck and a mark roughly the size of a dull pencil head. Both caseworkers had a planned visit to R.W.'s foster home that evening and assured Parents their concerns would be thoroughly investigated.

**{¶18}** After stating their concerns regarding R.W.'s welfare, Parents refused to review the case plan and left the meeting. Before leaving, Father objected to the case plan requirement that he attend parenting classes, however he agreed Mother should be required to attend them.

**{¶19}** During the course of this case, orders of support against both parents were requested by the Agency and entered by the juvenile court. Neither party voluntarily complied with the respective orders.

**{¶20}** On November 2, 2023, Dickson conducted an unannounced visit at Mother's new home in West Virginia. The trailer was fairly clean with working utilities. The home was being rented for Mother by R.W.'s maternal grandmother. When Mother failed to appear for a scheduled visit with R.W., the caseworker contacted Mother, who claimed her car had been impounded after she lent it to a friend. Mother was still unemployed but claimed she had secured a job at a local Wendy's. Dickson provided cleaning supplies, diapers, and gas cards to Mother. (11/29/23 Supervisor's Report.)

**{¶21}** At an unscheduled visit with Father on November 28, 2023, Father told Dickson that Mother had reclaimed her automobile so Parents would be able to resume supervised visitation with R.W. Father expressed his desire to know if R.W. was his child. He explained Mother did not question his paternity until after he signed the birth certificate. It is important to note, Father typically avoided admitting Dickson into the Anderson Boulevard residence during her unannounced visits, despite the fact that she clearly stated entry was a requirement in order for her to assess the residence.

Case No. 25 CO 0023

{¶22} Following the dispositional hearing conducted on December 13, 2023, R.W. was adjudicated an abused child, defined in R.C. 2151.031(D), as "exhibit[ing] evidence of any physical or mental injury . . . inflicted other than by accidental means, or an injury . . . which is at variance with the history given it." In an order filed on December 26, 2023 following the dispositional hearing, the juvenile court found it was in R.W.'s best interest to remain in the temporary custody of the Agency. Following the hearing, Cochran encouraged Mother to enter mental health counseling. Mother explained she did not have transportation and could not attend counseling. The case plan was filed that same day.

{¶23} During an Agency visit with Mother at the home of one of Mother's friends on January 18, 2024, Mother introduced a man, B.W., who was unknown to Dickson, as Mother's husband. Dickson asked when the couple had married, and Mother explained they were to be married roughly one month later on Valentine's Day.

{¶24} The house had a strong odor of dog and there was a black substance covering the top of the coffee table. There were other adults living in the house, who Mother characterized as "friends that turned into family." (5/13/2025 Agency final report, p 6.)

{¶25} Mother informed Dickson that Mother was still unemployed. Mother further claimed she frequently missed visits with R.W. at the Agency due to her lack of transportation. Dickson recommended the Community Action Rural Transit System ("CARTS"), a daily demand transit service available in Columbiana County. Mother said she could not afford the nominal fee charged by CARTS. Dickson explained Mother would be required to "double confirm" supervised visitation (both the day before and the morning of a visit) due to Mother's failure to attend previous scheduled visits.

{¶26} B.W. informed Dickson that he was a social security recipient and he intended to purchase an automobile with the proceeds of his next benefits check. Mother informed Dickson she intended to schedule a psychological assessment and parenting classes as soon as transportation was available. However, more than a month later, Mother had not scheduled a psychological assessment, or mental health or substance abuse treatment.

**{¶27}** At the March 6, 2024 review hearing, the juvenile court found R.W.'s interest was best served in the continuing temporary custody of the Agency. Two caseworkers reported Mother was impaired at the hearing.

**{¶28}** During an unannounced visit on April 22, 2024, Dickson reported Mother had not made any progress with respect to treatment and that her body and clothes were dirty and her hands were heavily-soiled. Mother once again attributed her failure to make any progress on the case plan to her lack of transportation.

**{¶29}** Mother reported Father had informed her he had no intention of complying with the case plan. Dickson asked if Mother was comfortable with ongoing joint supervised visitation with Father and Mother replied Father would not likely continue to attend.

**{¶30}** After Mother was cautioned about her marked lack of compliance and the upcoming six-month review of the case plan, she reported in May of 2024 that she had begun parenting classes and was participating in mental health and drug treatment at the Counseling Center in East Liverpool, Ohio.

**{¶31}** Parents attended supervised visitation on May 16, 2024. Father indicated he was attending parenting classes and planned to schedule substance abuse treatment. Neither parent had scheduled a psychological assessment.

**{¶32}** Father asked if Mother was more likely to regain custody of R.W. if the couple "stay[ed] apart," as Parents were hoping to "get back together." (*Id*., p. 8.) Dickson explained each parent would be considered based on their own compliance with the case plan.

**{¶33}** Dickson explained financial assistance was available for home improvements to the Anderson Boulevard residence if Parents showed progress on other case plan goals. Parents submitted to drug tests. Mother tested negative, but Father tested positive for amphetamines and methamphetamines. He conceded prior to testing that Mother had a "head start on her sobriety." (*Id.*)

**{¶34}** At the review hearing conducted on May 29, 2024, the juvenile court found R.W.'s interest was best served in the continuing temporary custody of the Agency. A third review hearing was scheduled for November 20, 2024.

{¶35} Mother conceived a child at some time in May of 2024. However, it is not clear from the record when Mother became aware of her pregnancy.

{¶36} In June of 2024, Mother requested a referral for a psychological assessment and reported that she was employed at a recycling center in East Liverpool. Father informed Dickson that the couple's reconciliation lasted roughly a week because Mother wanted to "run around."

{¶37} Dickson made several unsuccessful attempts to meet with Parents in July of 2024. Dickson attempted to meet with Mother after a scheduled visitation, however Mother did not have time because she had another appointment.

{¶38} In August of 2024, Mother reported she had lost her job due to her prior boyfriend and his friends. Mother was clean and well-groomed and had only two parenting classes to attend to receive her certificate of completion. However, Mother's drug screen returned a positive result for methamphetamines. Dickson observed Mother's willingness to participate in meetings with the Agency had waned since she reunited with Father in July and Parents were cohabitating at the Anderson Boulevard residence.

{¶39} Following a supervised visit on October 3, 2024, Parents refused to undergo a drug screen. Dickson cautioned them that they were required to submit a drug sample within twenty-four hours, otherwise it would be treated as a de facto positive drug screen. Dickson further cautioned Parents that supervised visitation would be suspended in the event of a positive screen.

{¶40} On October 22, 2024, the Agency filed a motion for permanent custody. The motion alleged R.W. had been in the Agency's custody for twelve or more months of a consecutive twenty-two month period and it would be in R.W.'s best interest to be placed in the permanent custody of the Agency. At a pretrial hearing conducted the same day, the Agency expressed its intent to withdraw and refile the motion at a later date as the motion was premature. (1/17/25 J.E., p. 1.)

{¶41} A child enters the temporary custody of a children services agency for statutory purposes on the earlier of the date that the child is adjudicated pursuant to R.C. 2151.28, or the date that is sixty days after the removal of the child from home. R.C. 2151.414(B)(1). R.W. entered the temporary custody of the Agency on September 22, 2023. He was adjudicated a neglected child on December 13, 2023. Consequently, R.W.

entered the temporary custody of the Agency for statutory purposes on November 22, 2023. Despite the fact that the Agency expressed its intention to withdraw the motion, a pretrial hearing on the motion was scheduled for January 7, 2025.

**{¶42}** R.W.'s placement was changed in October of 2024 because he had scabs on his head from scratching due to head lice and was generally unclean. (11/14/2024 Agency report.) During a home visit on November 19, 2024, the Anderson Boulevard residence still had no running water or electricity.

**{¶43}** Following the review hearing on November 20, 2024, the juvenile court found R.W's interest was best served in the continuing temporary custody of the Agency. A fourth review hearing was scheduled for May 21, 2025. Parents were drug tested after the hearing.

**{¶44}** On November 21, 2024, Mother informed an Agency staff member that she was approximately six-months pregnant. Supervised visitation was terminated as Parents' November 21, 2024 drug screens were positive for amphetamines and methamphetamines. Father also tested positive for cocaine.

**{¶45}** On November 28, 2024, Dickson received a telephone message from Mother indicating Mother had a negative drug screen. The following day, Mother accused Dickson and the Agency of "trying to fail [Parents]." (*Id.*, p. 11.)

**{¶46}** Parents were provided the opportunity in December of 2024 to resume supervised visits, conditioned upon negative drug screens. Neither parent underwent a drug screen.

**{¶47}** Dickson visited Mother in the Columbiana County jail on January 7, 2025. Mother was previously on bond as a result of a pending drug possession charge, but her bond was revoked when she tested positive for illegal drugs. Mother had an expected delivery date of early February.

**{¶48}** On January 8, 2025, the Agency filed a motion to dismiss the pending motion for permanent custody contemporaneously with an identical motion for permanent custody. The Agency requested permanent custody of R.W. citing its continuous efforts at reconciliation and Parents' ongoing illegal drug use and failure to fulfill the goals of the case plan.

{¶49} Dickson provided the following summary in an Agency report submitted to the juvenile court on January 17, 2025:

> Worker Dickson has continued to make monthly visits with [Mother and Father] to monitor case plan progress. Worker continues to make monthly visits with [R.W.] at his placement. Worker had spoken to Akron [Children's Hospital] to monitor [R.W.'s] health and wellness. The agency has provided [Mother] with hygiene products and cleaning supplies. The agency has approved gas cards for visitation of [Mother]. The agency has provided diapers and wipes for [R.W.]. A case plan meeting was held. Worker Dickson made a parenting class referral for [Mother] for Project Safe, as well as a referral to The Counseling Center for a psychological evaluation. Worker Dickson made a referral for parenting classes for [Father] for Project Safe.
>
> . . .
>
> Minimal case plan progress has been made by [Mother and Father]. There are no approved or pending home studies at this time. On 10/22/24 the agency filed a motion for permanent custody. [Mother and Father] continue to test positive for illegal substances and do not have the means to provide for [R.W.]

(1/17/25 Report, p. 2-4.)

{¶50} On the date the pleading was filed, both Mother and Father were in jail – Father for failure to pay child support, and Mother "for charges of aggravated possession of drugs." (*Id.*, p. 2.) That same day, the juvenile court issued a judgment entry accepting the report as a stipulation between the parties regarding the Agency's reasonable efforts at reunification. The judgment entry reads in relevant part:

> The [Agency] has prepared and submitted to the Court, and counsel for the parents, proposed findings in support of the Agency's reasonable efforts to make possible the return of the minor child to the care or custody

Case No. 25 CO 0023