[Cite as *In re R.W.*, 2025-Ohio-4766.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

IN THE MATTER OF: R.W.,

A NEGLECTED/DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0023**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Columbiana County, Ohio
Case No. J2023-0111-5

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Christopher P. Lacich,* Roth, Blair, for Appellant and

*Atty. Vito Abruzzino*, Columbiana County Prosecutor and *Atty. Danielle Menning*
Assistant Prosecuting Attorney, for Appellee.

Dated:  October 16, 2025

**DICKEY, J.**

**{¶1}** Appellant, A.B. ("Mother") appeals the June 10, 2025 judgment entry of the Columbiana County Court of Common Pleas, Juvenile Division, sustaining the motion for permanent custody of R.W. (d.o.b. 5/13/2023) filed by the Columbiana County Department of Job and Family Services ("Agency"). R.P.W. ("Father") was represented by counsel throughout the proceedings but did not appear at the merits hearing conducted on May 20, 2025 and did not appeal the judgment entry terminating his parental rights.

**{¶2}** In Mother's sole assignment of error, she contends the juvenile court committed reversible error because granting custody of R.W. to the Agency was not in R.W.'s best interest, such that the judgment entry was based on legally insufficient evidence and against the manifest weight of the evidence. Finding no reversible error, the June 10, 2025 judgment entry of the juvenile court terminating Mother's parental rights of R.W. is affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶3}** There is no transcript of the merits hearing due to a mechanical failure of the recording equipment. Pursuant to an order of this Court, the parties submitted their respective Appellate Rule 9(C) statements of evidence for the juvenile court's review. Following a hearing on September 5, 2025, the juvenile court issued an approved statement of evidence, amending certain statements submitted by the parties based on the juvenile court's recollection of the testimony at the hearing. In addition, the juvenile court attached its handwritten notes from the merits hearing to the approved statement of evidence. As a consequence, the following facts are taken from the case file, the Appellate Rule 9(C) statements, as amended by the juvenile court, and the approved statement of evidence.

**{¶4}** A voluntary protective intervention was initiated by the Agency on May 15, 2023, two days after R.W.'s birth, as Mother's drug screen returned positive results for amphetamines, methamphetamines, and tetrahydrocannabinol ("THC") prior to delivery. Although R.W.'s urine did not test positive for drugs, a Cord Stat test performed on R.W.'s umbilical cord returned positive results for amphetamines, methamphetamines, and THC.

**{¶5}** At the time of the initial referral and investigation, Mother and Father (collectively "Parents") resided in a home either owned or rented by Father on Anderson Boulevard in East Liverpool, Ohio ("Anderson Boulevard residence"), with no working utilities. Father is a registered sex offender.

**{¶6}** Based on the foregoing facts, the Agency continued to monitor R.W. and Parents after Mother and R.W. were released from the hospital. Over the course of several months, R.W.'s weight continuously declined and a case report establishes the skin on R.W.'s arms and legs was elastic and his eyes were sunken. Suspecting malnutrition, the Agency questioned Mother about her feeding regimen and provided cursory instruction on proper feeding methods.

**{¶7}** During this time, Mother's drug screens continued to return positive results for THC. Father initially refused to submit to drug screens, but later tested positive for amphetamines, methamphetamines, and THC. Agency oversight was discontinued in July after R.W. began gaining weight.

**{¶8}** In early September of the same year, the Agency received reports of domestic abuse and continuing illegal drug use at the Anderson Boulevard residence. Mother was seen shaking R.W. and holding him by one leg, as well as striking R.W. in the mouth with such force that she drew blood.

**{¶9}** Two individuals residing at the Anderson Boulevard residence reported Father was incarcerated due to his failure to make child support payments. Mother had been living at a residence in West Virginia for the previous two weeks and regularly abandoned R.W. for hours, and sometime days at a time, at the Anderson Boulevard residence in the care of others. The couple suspected but could not confirm Mother's use of illegal drugs. (10/19/23 Home Study.)

**{¶10}** An emergency oral motion was made by the Agency and sustained by the juvenile court on September 22, 2023, pursuant to Juvenile Rule 13, placing R.W. in the temporary emergency custody of the Agency. A complaint filed by the Agency that same day alleged R.W. was a neglected and dependent child. Mother conceded to leaving R.W. in the care of others for weeks and claimed R.W. had not been in her care for a month leading up to the filing of the Agency's complaint. An amended complaint was filed on October 23, 2023 alleging R.W. was an abused and dependent child.

**{¶11}** A woman, D.R., made a third referral to the Agency when Mother abandoned R.W. and left him in D.R.'s care for five days. D.R. reported Mother was abusing illegal drugs and frequently left R.W. in D.R.'s care for days at a time. Mother reportedly left R.W. in the care of known illegal drug abusers as well. C.W., R.W.'s maternal grandmother, telephoned the Agency and reported Mother had "signed custody over," but it had not been processed through the juvenile court.

**{¶12}** Mother, Father, D.R., C.W., and two friends of Mother attended the probable cause hearing conducted on September 25, 2023. Parents were drug tested prior to the hearing. Mother was negative for all tested substances, while Father tested positive for amphetamines, methamphetamines, and THC.

**{¶13}** Mother, who warranted she was drug-free prior to the test results, testified she had filed a petition for a temporary restraining order against Father, but would not disclose the incident or incidents precipitating the petition. Mother reported she was living alone in a trailer in West Virginia and waiting for confirmation that she had secured employment. She refused to authorize an Agency visit because she needed additional time to set up the home. The juvenile court entered an order continuing the Agency's temporary emergency custody of R.W.

**{¶14}** Mother did not pursue the temporary restraining order against Father. However, in the weeks that followed, she accused Father of domestic abuse and claimed another man was R.W.'s biological father, despite Father's identification as R.W.'s father on R.W.'s birth certificate. (11/29/23 Supervisor's Report.)

**{¶15}** During an unannounced Agency visit at the Anderson Boulevard residence on October 9, 2023, Parents were both present, but they claimed it was the first time they had seen each other since the September 25, 2023 hearing. Mother declared herself drug-free and refused to undergo a drug test. She reported she had applied for a job in West Virginia as a security guard for an oil company.

**{¶16}** On October 19, 2023, the proposed case plan was provided to Parents. The proposed plan raised six concerns: (1) parents' mental health; (2) the lack of safe, stable, and appropriate housing; (3) parents' lack of parenting skills and use of appropriate parenting practices; (4) parents' drug use; (5) Mother's diminished cognitive

ability and its effect on her ability to independently care for R.W.; and (6) R.W.'s basic needs not being met by a safe and appropriate caregiver.

**{¶17}** The original caseworker assigned by the Agency, identified in the record solely as "Worker Cochran," and Billie Jo Dickson ("Dickson"), the Agency caseworker newly assigned, conducted a meeting with Parents following the supervised visit with R.W. on October 19, 2023. Parents expressed concern about R.W.'s foster home, due to the fact that he was wearing dirty mismatched socks and was losing weight. R.W. also had a thin red mark along the base of his neck and a mark roughly the size of a dull pencil head. Both caseworkers had a planned visit to R.W.'s foster home that evening and assured Parents their concerns would be thoroughly investigated.

**{¶18}** After stating their concerns regarding R.W.'s welfare, Parents refused to review the case plan and left the meeting. Before leaving, Father objected to the case plan requirement that he attend parenting classes, however he agreed Mother should be required to attend them.

**{¶19}** During the course of this case, orders of support against both parents were requested by the Agency and entered by the juvenile court. Neither party voluntarily complied with the respective orders.

**{¶20}** On November 2, 2023, Dickson conducted an unannounced visit at Mother's new home in West Virginia. The trailer was fairly clean with working utilities. The home was being rented for Mother by R.W.'s maternal grandmother. When Mother failed to appear for a scheduled visit with R.W., the caseworker contacted Mother, who claimed her car had been impounded after she lent it to a friend. Mother was still unemployed but claimed she had secured a job at a local Wendy's. Dickson provided cleaning supplies, diapers, and gas cards to Mother. (11/29/23 Supervisor's Report.)

**{¶21}** At an unscheduled visit with Father on November 28, 2023, Father told Dickson that Mother had reclaimed her automobile so Parents would be able to resume supervised visitation with R.W. Father expressed his desire to know if R.W. was his child. He explained Mother did not question his paternity until after he signed the birth certificate. It is important to note, Father typically avoided admitting Dickson into the Anderson Boulevard residence during her unannounced visits, despite the fact that she clearly stated entry was a requirement in order for her to assess the residence.

Case No. 25 CO 0023

{¶22} Following the dispositional hearing conducted on December 13, 2023, R.W. was adjudicated an abused child, defined in R.C. 2151.031(D), as "exhibit[ing] evidence of any physical or mental injury . . . inflicted other than by accidental means, or an injury . . . which is at variance with the history given it." In an order filed on December 26, 2023 following the dispositional hearing, the juvenile court found it was in R.W.'s best interest to remain in the temporary custody of the Agency. Following the hearing, Cochran encouraged Mother to enter mental health counseling. Mother explained she did not have transportation and could not attend counseling. The case plan was filed that same day.

{¶23} During an Agency visit with Mother at the home of one of Mother's friends on January 18, 2024, Mother introduced a man, B.W., who was unknown to Dickson, as Mother's husband. Dickson asked when the couple had married, and Mother explained they were to be married roughly one month later on Valentine's Day.

{¶24} The house had a strong odor of dog and there was a black substance covering the top of the coffee table. There were other adults living in the house, who Mother characterized as "friends that turned into family." (5/13/2025 Agency final report, p 6.)

{¶25} Mother informed Dickson that Mother was still unemployed. Mother further claimed she frequently missed visits with R.W. at the Agency due to her lack of transportation. Dickson recommended the Community Action Rural Transit System ("CARTS"), a daily demand transit service available in Columbiana County. Mother said she could not afford the nominal fee charged by CARTS. Dickson explained Mother would be required to "double confirm" supervised visitation (both the day before and the morning of a visit) due to Mother's failure to attend previous scheduled visits.

{¶26} B.W. informed Dickson that he was a social security recipient and he intended to purchase an automobile with the proceeds of his next benefits check. Mother informed Dickson she intended to schedule a psychological assessment and parenting classes as soon as transportation was available. However, more than a month later, Mother had not scheduled a psychological assessment, or mental health or substance abuse treatment.

Case No. 25 CO 0023

**{¶27}** At the March 6, 2024 review hearing, the juvenile court found R.W.'s interest was best served in the continuing temporary custody of the Agency. Two caseworkers reported Mother was impaired at the hearing.

**{¶28}** During an unannounced visit on April 22, 2024, Dickson reported Mother had not made any progress with respect to treatment and that her body and clothes were dirty and her hands were heavily-soiled. Mother once again attributed her failure to make any progress on the case plan to her lack of transportation.

**{¶29}** Mother reported Father had informed her he had no intention of complying with the case plan. Dickson asked if Mother was comfortable with ongoing joint supervised visitation with Father and Mother replied Father would not likely continue to attend.

**{¶30}** After Mother was cautioned about her marked lack of compliance and the upcoming six-month review of the case plan, she reported in May of 2024 that she had begun parenting classes and was participating in mental health and drug treatment at the Counseling Center in East Liverpool, Ohio.

**{¶31}** Parents attended supervised visitation on May 16, 2024. Father indicated he was attending parenting classes and planned to schedule substance abuse treatment. Neither parent had scheduled a psychological assessment.

**{¶32}** Father asked if Mother was more likely to regain custody of R.W. if the couple "stay[ed] apart," as Parents were hoping to "get back together." (*Id.*, p. 8.) Dickson explained each parent would be considered based on their own compliance with the case plan.

**{¶33}** Dickson explained financial assistance was available for home improvements to the Anderson Boulevard residence if Parents showed progress on other case plan goals. Parents submitted to drug tests. Mother tested negative, but Father tested positive for amphetamines and methamphetamines. He conceded prior to testing that Mother had a "head start on her sobriety." (*Id.*)

**{¶34}** At the review hearing conducted on May 29, 2024, the juvenile court found R.W.'s interest was best served in the continuing temporary custody of the Agency. A third review hearing was scheduled for November 20, 2024.

{¶35} Mother conceived a child at some time in May of 2024. However, it is not clear from the record when Mother became aware of her pregnancy.

{¶36} In June of 2024, Mother requested a referral for a psychological assessment and reported that she was employed at a recycling center in East Liverpool. Father informed Dickson that the couple's reconciliation lasted roughly a week because Mother wanted to "run around."

{¶37} Dickson made several unsuccessful attempts to meet with Parents in July of 2024. Dickson attempted to meet with Mother after a scheduled visitation, however Mother did not have time because she had another appointment.

{¶38} In August of 2024, Mother reported she had lost her job due to her prior boyfriend and his friends. Mother was clean and well-groomed and had only two parenting classes to attend to receive her certificate of completion. However, Mother's drug screen returned a positive result for methamphetamines. Dickson observed Mother's willingness to participate in meetings with the Agency had waned since she reunited with Father in July and Parents were cohabitating at the Anderson Boulevard residence.

{¶39} Following a supervised visit on October 3, 2024, Parents refused to undergo a drug screen. Dickson cautioned them that they were required to submit a drug sample within twenty-four hours, otherwise it would be treated as a de facto positive drug screen. Dickson further cautioned Parents that supervised visitation would be suspended in the event of a positive screen.

{¶40} On October 22, 2024, the Agency filed a motion for permanent custody. The motion alleged R.W. had been in the Agency's custody for twelve or more months of a consecutive twenty-two month period and it would be in R.W.'s best interest to be placed in the permanent custody of the Agency. At a pretrial hearing conducted the same day, the Agency expressed its intent to withdraw and refile the motion at a later date as the motion was premature. (1/17/25 J.E., p. 1.)

{¶41} A child enters the temporary custody of a children services agency for statutory purposes on the earlier of the date that the child is adjudicated pursuant to R.C. 2151.28, or the date that is sixty days after the removal of the child from home. R.C. 2151.414(B)(1). R.W. entered the temporary custody of the Agency on September 22, 2023. He was adjudicated a neglected child on December 13, 2023. Consequently, R.W.

entered the temporary custody of the Agency for statutory purposes on November 22, 2023. Despite the fact that the Agency expressed its intention to withdraw the motion, a pretrial hearing on the motion was scheduled for January 7, 2025.

**{¶42}** R.W.'s placement was changed in October of 2024 because he had scabs on his head from scratching due to head lice and was generally unclean. (11/14/2024 Agency report.) During a home visit on November 19, 2024, the Anderson Boulevard residence still had no running water or electricity.

**{¶43}** Following the review hearing on November 20, 2024, the juvenile court found R.W's interest was best served in the continuing temporary custody of the Agency. A fourth review hearing was scheduled for May 21, 2025. Parents were drug tested after the hearing.

**{¶44}** On November 21, 2024, Mother informed an Agency staff member that she was approximately six-months pregnant. Supervised visitation was terminated as Parents' November 21, 2024 drug screens were positive for amphetamines and methamphetamines. Father also tested positive for cocaine.

**{¶45}** On November 28, 2024, Dickson received a telephone message from Mother indicating Mother had a negative drug screen. The following day, Mother accused Dickson and the Agency of "trying to fail [Parents]." (*Id.*, p. 11.)

**{¶46}** Parents were provided the opportunity in December of 2024 to resume supervised visits, conditioned upon negative drug screens. Neither parent underwent a drug screen.

**{¶47}** Dickson visited Mother in the Columbiana County jail on January 7, 2025. Mother was previously on bond as a result of a pending drug possession charge, but her bond was revoked when she tested positive for illegal drugs. Mother had an expected delivery date of early February.

**{¶48}** On January 8, 2025, the Agency filed a motion to dismiss the pending motion for permanent custody contemporaneously with an identical motion for permanent custody. The Agency requested permanent custody of R.W. citing its continuous efforts at reconciliation and Parents' ongoing illegal drug use and failure to fulfill the goals of the case plan.

{¶49} Dickson provided the following summary in an Agency report submitted to the juvenile court on January 17, 2025:

> Worker Dickson has continued to make monthly visits with [Mother and Father] to monitor case plan progress. Worker continues to make monthly visits with [R.W.] at his placement. Worker had spoken to Akron [Children's Hospital] to monitor [R.W.'s] health and wellness. The agency has provided [Mother] with hygiene products and cleaning supplies. The agency has approved gas cards for visitation of [Mother]. The agency has provided diapers and wipes for [R.W.]. A case plan meeting was held. Worker Dickson made a parenting class referral for [Mother] for Project Safe, as well as a referral to The Counseling Center for a psychological evaluation. Worker Dickson made a referral for parenting classes for [Father] for Project Safe.
>
> . . .
>
> Minimal case plan progress has been made by [Mother and Father]. There are no approved or pending home studies at this time. On 10/22/24 the agency filed a motion for permanent custody. [Mother and Father] continue to test positive for illegal substances and do not have the means to provide for [R.W.]

(1/17/25 Report, p. 2-4.)

{¶50} On the date the pleading was filed, both Mother and Father were in jail – Father for failure to pay child support, and Mother "for charges of aggravated possession of drugs." (*Id.*, p. 2.) That same day, the juvenile court issued a judgment entry accepting the report as a stipulation between the parties regarding the Agency's reasonable efforts at reunification. The judgment entry reads in relevant part:

> The [Agency] has prepared and submitted to the Court, and counsel for the parents, proposed findings in support of the Agency's reasonable efforts to make possible the return of the minor child to the care or custody

Case No. 25 CO 0023

of the child's parent or parents and, alternatively, to provide permanency for the minor child by pursuit of the Motion for Permanent Custody and long-term placement of the child in an adoptive or other appropriate home. The Court was advised by counsel for the parents that there was no objection to the Court's adoption of the proposed findings in support of the Agency's reasonable efforts. Upon the Court's independent review of the proposed findings submitted by the Agency, the Court finds them appropriate and consistent with the record in this case.

(1/17/25 J.E., p. 1.)

{¶51} On January 27, 2025, Mother gave birth to a daughter, K.D.W. K.D.W. was placed in the same foster home as R.W. and shares Father's surname.

{¶52} Mother was still incarcerated when the merits hearing was held on May 20, 2025. According to the judgment entry on appeal, Appellant was sentenced on a probation violation from a prior drug conviction and incarcerated to an indefinite sentence at Eastern Ohio Correction Center ("EOCC") in January of 2025.

{¶53} However, a review of the Columbiana County Clerk of Court's online docket (2024 CR 509) establishes Mother was charged on September 11, 2024 by secret indictment with aggravated possession of drugs (methamphetamine), in violation of R.C. 2925.11(A), a felony of the fifth degree. Mother successfully moved the trial court for intervention in lieu of conviction.

{¶54} On February 28, 2025, Mother entered a guilty plea to the aggravated possession charge and was sentenced to an indefinite term of incarceration at EOCC until she successfully completed the residential drug program. The trial court further imposed a treatment plan for a period of three years following Mother's release from EOCC, to be supervised by the Columbiana County Adult Probation Department.

{¶55} The judgment entry in the criminal case reads in relevant part:

> The Court hereby reserves jurisdiction in the event of [Mother's] failure to abide by the terms and conditions of the Treatment Plan to impose the maximum penalty provided by law: As to Count One: A twelve (12)

month term of incarceration in a state correctional facility. A six (6) month
to five (5) year operator's license suspension and a fine of $2,500.

(2/28/2025 J.E., p. 2.)

{¶56}  R.W. and K.D.W. were placed in another home on March 10, 2025, due to the previous foster mother's pregnancy.  Previous foster mother suffered ten miscarriages in the past, and was fearful that the additional responsibility of caring for an infant and a baby would tax her beyond her physical limits during her current pregnancy. During Dickson's monthly visits, she observed the children were adjusting well to the new placement and new foster parents felt as though an observer would presume the children had been with them from birth.

{¶57} A letter from Dickson to the juvenile court filed on May 13, 2025 is essentially a summary of the events from the outset of the Agency's involvement with R.W. to the week prior to the merits hearing.  According to the Dickson letter, supervised visitation with R.W. and K.D.W. was suspended due to Parents' positive drug screens, or in the alternative, their refusal to undergo drug tests. Mother had been added to the visitation list for May 13, 2025. Although Parents' attendance at supervised visitation was inconsistent, visitation staff noted visits were without incident, and Mother relied on Father "to intervene and do small tasks such as wiping [R.W.'s] nose, changing his diaper and playing with him."  (5/13/2025 Dickson Letter, p. 12.)

{¶58}  With respect to the case plan, the Dickson letter establishes Father has consistently blamed his lack of progress on the case plan due to his lack of transportation.  His driver's license was suspended due to his failure to pay child support.  However, neither parent had taken advantage of CARTS or the gas cards provided by the Agency.  At the time the Dickson letter was compiled, Mother was residing at the Anderson Boulevard residence.

{¶59} Father had not completed parenting classes.  Mother had completed parenting classes, but failed to complete two mentoring sessions.  Mother had scheduled a mentoring session for December 5, 2024, but supervised visitation was suspended due to positive drug screens for both parents.

{¶60} With respect to drug counseling, Mother began treatment at Family Recovery in the fall of 2023, and was initially making significant progress. Mother stopped attending drug counseling due to transportation problems, and never resumed treatment at Family Recovery. Mother resumed substance abuse treatment in May of 2024 at On Demand in East Liverpool, however the last appointment she attended was on May 17, 2024.

{¶61} At the merits hearing on May 20, 2025, Billie Jo Dickson, Ryan Dilworth, and Gretchen Emch appeared on behalf of the Agency. Mother appeared pursuant to a motion to transfer her from EOCC. Father did not appear. All parties were represented by counsel. The court-appointed special advocate ("CASA") for R.W. also appeared.

{¶62} Two witnesses testified at the merits hearing, Dickson on behalf of the Agency and Mother on her own behalf. The Agency requested without objection that the juvenile court take judicial notice of the entire case file. Although the CASA did not testify, the juvenile court admitted a series of status reports submitted by the CASA to the juvenile court throughout the pendency of this matter regarding R.W.'s status in foster care and Parents' progress with the case plan into the record. The juvenile court also admitted R.W.'s birth certificate and the previous stipulation of all parties establishing the Agency's reasonable efforts at reunification without objection.

{¶63} According to Dickson's testimony, the Agency's initial referral in this case was on May 15, 2023, two days after R.W.'s birth, due to Mother's positive drug screen for THC, amphetamines, and methamphetamines, and R.W.'s subsequent positive Cord Stat drug screen for THC, amphetamines, and methamphetamines. Mother and Father agreed to work with the Agency on a voluntary basis.

{¶64} The second referral was received on September 8, 2023 regarding physical abuse at the Anderson Boulevard residence, including the accusation that Mother struck R.W.'s face with such force that he bled from his mouth. The third referral was received when Mother left R.W. with D.R. and did not return for five days.

{¶65} Based on the foregoing referrals, the juvenile court granted temporary custody of R.W. to the Agency on September 22, 2023 by way of an emergency order. R.W. remained in the Agency's uninterrupted custody through the date of the judgment entry on appeal.

Case No. 25 CO 0023

**{¶66}** Dickson further testified her responsibilities as the assigned caseworker included making contact with each parent once per month. If the initial effort was unsuccessful, she was required to make a total of three attempts each month. Dickson provided testimony with respect to each of the concerns identified by the case plan and concluded Parents did not accomplish any of the goals set forth therein.

**{¶67}** With respect to Mother's illegal drug use, Dickson testified Mother initially engaged in counseling at the Family Recovery Center in Lisbon, Ohio, but she did not follow counseling recommendations. Mother later engaged in treatment at On Demand Counseling Services in East Liverpool, Ohio, however her attendance was sporadic and she was eventually terminated from the program due to her failure to appear.

**{¶68}** Mother likewise failed to acquire a safe and stable residence. Mother had abandoned the trailer in West Virginia when she returned to Father and the Anderson Boulevard residence after the couple reconciled. No home study had been requested.

**{¶69}** Regarding Mother's parenting skills, she completed basic parenting classes but did not complete the required mentoring visits. Although Mother was provided weekly two-hour companionship visits with R.W., the visits were terminated due to her spotty attendance and repeated failed drug screens. Mother's companionship was reinstated just prior to the merits hearing and she had one visit with R.W.

**{¶70}** Moreover, the record reflects Father was R.W.'s primary caregiver during the supervised visits. Dickson summarized R.W.'s interaction with parents at the supervised visitation in the May 13, 2025 letter as follows, "[p]reviously [Mother and Father] were not consistently visiting with R.W. Visitation staff have noted that the visits [Mother and Father] did attend went well, however [Mother] relies on [Father] to intervene to do small tasks such as wiping [R.W.'s] nose, changing his diaper, and playing with him." (*Id.*) Further, Father balked at the case plan requirement that he had to attend parenting classes, but acknowledged that Mother should be required to attend them.

**{¶71}** With respect to Mother's illegal drug use, the Dickson letter contains a chart summarizing Mother's drug test results, which is recreated below and adds notations with respect to Mother's pregnancy with K.D.W. and incarceration:

**2023**

| | |
|---|---|
| 10/25 | negative for all substances |
| 12/13 | amphetamines and methamphetamines |

**2024**

| | |
|---|---|
| 01/18 | negative for all substances |
| 03/06 | refused drug test |
| 03/07 | refused drug test |
| 04/22 | negative for all substances |
| 05/16 | negative for all substances |
| 08/29 | amphetamines and methamphetamines (pregnant) |
| 10/03 | refused Agency drug screen (pregnant) |
| 11/20 | amphetamines and methamphetamines (pregnant) |

**2025**

| | |
|---|---|
| 01/24 | negative for all substances (pregnant/incarcerated) |
| 03/14 | negative for all substances (incarcerated) |

(*Id.,* p. 18.)

**{¶72}** With respect to Mother's mental health, she underwent a psychological assessment with John Gzrebieniak, Ph.D., the director of Psychological Services at the Counseling Center on September 11, 2024. Dr. Gzrebieniak's report is not in the record. However, Dickson summarized the report as follows:

> [Mother] has low average mental abilities, and [Mother] is likely to be emotionally insecure, socially avoidant, and is harboring considerable anger and suspiciousness. The report recommends that if [R.W.] were to be returned to her custody it should be with the condition of continued monitoring of her [parenting], interpersonal associations, and [Mother] should be subject to random drug screenings.

(*Id.,* p. 19.)

{¶73} Finally, Dickson testified neither Mother nor Father was currently able to care for R.W. as the initial concerns that were identified in the case plan had not been remedied. Mother gave birth to K.D.W. during Mother' incarceration. K.D.W. was also placed in the temporary custody of the Agency and was adjudicated a dependent child.

{¶74} Dickson testified R.W. and K.D.W. share the same foster home, which offers the opportunity of permanency for both children. The children also share Father's last name, despite the fact that Mother asserted at the merits hearing that another man fathered K.D.W. and that she intended to live with him after she was released from jail.

{¶75} According to the CASA reports, R.W. was well cared for and happy in his foster placement. Further, in a report filed May 7, 2025, the CASA opined it was in R.W.'s best interest to be in the permanent custody of the Agency, as "parents have made very little attempt to work with their case worker and follow the steps to have [R.W.] returned to them." She further opined, "[R.W.] deserves to be with a family who will be able to provide for all his needs." (CASA Report, p. 3.)

{¶76} Mother testified at the merits hearing on her own behalf. She admitted she was incarcerated at the Columbiana County jail from January to March of 2025, and currently incarcerated at EOCC since March 11, 2025, with an expected release date in July of 2025. She further admitted she had continued to test positive for illegal drugs up to the time of her incarceration in January of 2025.

{¶77} Mother attributed her illegal drug use exclusively to her relationship with Father. She also blamed Father for the transportation problems that purportedly stalled her efforts to comply with the case plan. However, Mother testified both her illegal drug use and her relationship with Father were in her past.

{¶78} While incarcerated, Mother completed a series of therapeutic programs including "Parenting Café" while at the Columbiana County Jail, a program that focuses on stable living and discerning proper life choices. At EOCC, Mother obtained certificates in Women Drug and Alcohol, Money Management, Cognitive Behavioral Intervention, Victim Impact, and Health and Wellness.

{¶79} Mother testified she intended to secure stable housing following her release from prison with the father of her second child, who she identified as R.W.W. She also intended to find employment, continue to refrain from illegal drug and alcohol use, and

Case No. 25 CO 0023

continue drug abuse counseling. Finally, Mother testified she would have family support in her efforts to care for R.W.

{¶80} On June 10, 2025, the juvenile court issued the judgment entry on appeal terminating the parental rights of both Mother and Father. First, the juvenile court acknowledged the prior stipulation of the parties agreeing the Agency engaged in reasonable efforts to reunite Parents and R.W.

{¶81} Next, the juvenile court considered each of the concerns cited in the case plan and concluded Mother had not eliminated any of them. Although Mother had undergone a psychological evaluation, she was found to be low functioning and unable to care for R.W. on her own. Neither parent had secured stable employment or obtained safe housing. Mother had completed parenting classes but failed to complete mentoring visits, as her supervised visitation was suspended due to her illegal drug use. Prior to the suspension of supervised visitation, Mother's visits with R.W. were sporadic. Although Mother initiated drug counseling at two different facilities, she did not continue beyond a few sessions. Mother tested positive for drugs, or refused to submit to drug tests, throughout the pendency of the case.

{¶82} With respect to Mother's testimony at the merits hearing, the juvenile court opined:

> The Court recognizes that during her period of incarceration at [EOCC], [Mother] has completed rehabilitation and training regarding critical thinking skills, orientation, money management, anger management and other various rehabilitation programs. She reports that she is not expected to be released for [EOCC] until some time in July of 2025. Upon her release, she indicates a desire to live potentially with the father of [K.D.W.] rather than return to reside with [Father]. The Court notes however that since the birth of [K.D.W.], she has returned to reside with [Father], despite having a relationship with the father of [K.D.W.] [Mother] has not only returned to [Father's] household, but reengaged in drug use. This Court continues to have significant concern due to [Mother] being low-functioning and significantly dependent, that she will remain vulnerable to abuse, exploitation, and drug relapse.

Case No. 25 CO 0023

(6/10/25 J.E., p. 6-7.)

{¶83} Turning to the best interest of R.W., the juvenile court considered the factors in R.C. 2151.414(D)(1) and concluded:

[R.W.] has not had an opportunity to effect a substantial and bonded relationship with [Parents] in that [Parents] had been absent from [R.W.'s] life for a substantial portion of [R.W.'s] life due to incarceration and drug abuse. [R.W.] has continuously been in the temporary custody of the [Agency] since September 22, 2023, when [R.W.] was less than six months old. [R.W.] is in a foster care placement where [R.W.] has a loving, bonded and significant relationship with the foster care providers. The foster care provider presents a substantial opportunity for permanency for [R.W.] through adoption in the event [Parents'] rights are terminated herein. The foster parents have more than adequately provided for all of [R.W.'s] needs while in placement.

(*Id.,* p. 8.)

{¶84} In summary, the juvenile court concluded the Agency had put in place a case plan which identified concerns and goals to facilitate reunification, and employed reasonable efforts to assist Parents in remedying the problems that caused [R.W.] to be placed outside of their home. However, Parents failed "continuously and repeatedly to substantially remedy those conditions causing [R.W.] to be placed outside the home and custody of his parents." (*Id.*) Therefore, the juvenile court sustained the Agency's motion finding it was in R.W.'s best interest to award permanent custody to the Agency.

{¶85} This timely appeal followed.

## ASSIGNMENT OF ERROR

**THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED THE [AGENCY'S] MOTION FOR PERMANENT CUSTODY OF R.W., FOR THE SAME WAS NOT IN HIS BEST INTEREST, WAS**

**BASED ON LEGALLY INSUFFICIENT EVIDENCE, AND/OR WAS AGAINST THE MANIFEST WEIGHT OF EVIDENCE.**

{¶86} Appellant contends the juvenile court's decision is against the manifest weight of the evidence because it "failed to place the necessary credibility and weight on [Mother's] testimony," and did not "recogn[ize] that there were alternatives to granting [the Agency's] Motion for Permanent Custody." (Appellant's Brf., p. 6.) Appellant further argues the juvenile court misinterpreted Dr. Gzrebieniak's opinion to mean Mother was incapable of independently caring for R.W., when Dr. Gzrebieniak actually opined Mother would require ongoing supervision and monitoring of her personal relationships, as well as drug testing. (Appellant's Brf., p. 7.) Finally, Appellant argues the majority of Mother's problems were due to her relationship with Father.

{¶87} Appellant writes:

> [T]he trial court was aware that many of the problems concerning [R.W.] stemmed from [Father], and at the time of the [merits hearing] [Mother] was incarcerated; had completed multiple courses for the betterment of herself and [R.W.] (child care/parenting/ lifestyle, and finance-related courses); had abstained from illicit drug use; and no longer was associated with [Father].
>
> . . .
>
> Ironically, at the time of the [merits hearing], [Mother's] incarceration allowed her to substantially remedy the conditions that caused the children to be placed outside the home.

(Appellant's Brf., p. 8-9.)

{¶88} The Agency argues the record contains competent, credible evidence supporting the juvenile court's decision to terminate Mother's parental rights. The Agency cites Mother's pre-incarceration conduct, which belies her attestation at the merits hearing that she will remain drug-free and will not resume her relationship with Father after her release from EOCC.

Case No. 25 CO 0023

**{¶89}** A parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The "permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *In re Hoffman*, 2002-Ohio-5368, ¶ 14. Based on these principles, the Ohio Supreme Court has determined a parent "must be afforded every procedural and substantive protection the law allows." (Citation omitted.) *Hayes* at 48.

**{¶90}** Nonetheless, the "interest of parents is not absolute." *In re K.H.*, 2008-Ohio-4825, ¶ 40. When the state properly invokes its statutory power to terminate parental rights, it may remove children from their parents' care when necessary for the welfare of the child without offending the Constitution. *Id.*

**{¶91}** R.C. 2151.414(B)(1) reads in relevant part:

> Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

> (b) The child is abandoned.

Case No. 25 CO 0023

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶92} Therefore, to terminate parental rights and grant permanent custody to the Agency, the juvenile court is required to make two independent findings by clear and convincing evidence. First, the juvenile court must find one of the grounds in R.C. 2151.414(B)(1) exists, and second, the juvenile court must find permanent Agency custody will serve the child's best interest.

{¶93} Neither party disputes R.W. had been in the temporary custody of the Agency for twelve of the last twenty-two months when the motion for permanent custody was filed, which satisfies the statutory requirement pursuant to R.C. 2151.414(B)(1)(d). Although the juvenile court recognized the applicability of subsection (d), it also undertook an analysis of subsection (a). As the parties concede that R.W. was in the temporary custody of the Agency for twelve of the previous twenty-two months on the date the motion for permanent custody was filed, we limit our analysis to whether permanent Agency custody is in R.W.'s best interest.

{¶94} With respect to the Agency's burden of proof before the juvenile court:

Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶95} Our standard of review, on the other hand, is more limited. A parent can raise sufficiency of the evidence and/or weight of the evidence as to the juvenile court's permanent custody decision. *In re Z.C.*, 2023-Ohio-4703, ¶ 18 (where the Supreme Court explained the standard of review is not abuse of discretion when these arguments are made). Sufficiency asks whether the evidence was adequate as a matter of law. *Id.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing the sufficiency of the evidence, we view all evidence, including reasonable inferences, in the light most favorable to the party filing the complaint to ascertain whether "any" rational trier of fact could have found the contested item proven by the applicable standard of proof. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

{¶96} Where an appellant claims the decision is contrary to the manifest weight of the evidence, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice requiring a new trial. *In re Z.C.* at ¶ 14. There is a presumption in favor of the trier of fact, to whom we defer in part because of their superior position from which to view the demeanor, gestures, and voice inflections of the witnesses in order to assess credibility. *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (construing the evidence consistent with the judgment when susceptible to more than one construction). "Although the concepts are different, the finding that a conviction is not against the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Boyd*, 2023-Ohio-271, ¶ 23 (7th Dist.).

{¶97} With that deference in mind, we turn to Mother's sole assignment of error. Mother argues the juvenile court's decision is against the manifest weight of the evidence because the juvenile court did not believe her testimony at the merits hearing. We find there is competent, credible evidence in the record supporting the juvenile court's credibility assessment of Appellant's testimony. R.W. was born with amphetamines, methamphetamines, and THC in his umbilical cord. Mother regularly abandoned R.W. for weeks at a time during the first six months of his life. She left him in the care of known drug abusers.

{¶98} When R.W. was in Mother's care, she abused him; shaking him, holding him by one leg, and striking him with such force on one occasion that she drew blood. She also provided insufficient nutrition to R.W., resulting in weight loss, elastic skin, and sunken eyes.

{¶99} Mother did not satisfy a single requirement of the case plan, but for undergoing the psychological assessment, which revealed she was of low intelligence and incapable of independently caring for R.W. Appellant argues the juvenile court misinterpreted Dr. Gzrebieniak's conclusion regarding her ability to independently care for R.W. Mother contends the juvenile court failed to acknowledge Dr. Gzrebieniak's opinion that she could regain custody with "the condition of continued monitoring of her [parenting], interpersonal associations, and [Mother] should be subject to random drug screenings." (Dickson Letter p., 19.) However, Mother's course of conduct prior to her incarceration provides no assurance that the foregoing conditions will adequately protect R.W.

{¶100} Appellant failed to attend drug and mental health counseling with any regularity, and she never managed a sustained period free of illegal drugs, including when she was pregnant with K.D.W. Likewise, she did not complete parenting classes until she was incarcerated.

{¶101} Mother asserted she would live with R.W.W. after she is released from EOCC. However, there is no evidence in the record that R.W.W.'s home could pass a home inspection. Moreover, R.W.W. did not seek custody of K.D.W., despite the fact that Mother claims he is K.D.W.'s biological father. The record does not contain any explanation for K.D.W.'s surname.

Case No. 25 CO 0023

{¶102} Mother demonstrated a marked inability to enter appropriate, supportive personal relationships. During the roughly eighteen months that R.W. was in the Agency's custody, Mother continued her relationship with Father despite repeated accusations of physical abuse. Mother informed Dickson of her plans to marry B.W., and characterized his friends as "friends that turned into family." Not long after, Mother had returned to Father, and accused her former boyfriend (presumably B.W.) and his friends of causing her to lose her job.

{¶103} The only evidence in the record which supports Mother's decree that she would remain drug-free and would not return to Father after she is released from EOCC is her own self-serving testimony. The juvenile court may have questioned Mother's true motivation for abstaining from illegal drugs while incarcerated, as she was subject to a possible one-year prison sentence and the loss of her operator's license should she violate the terms of her treatment.

{¶104} Similarly, the juvenile court's notes reveal skepticism regarding two other statements made by Mother at the merits hearing. First, the juvenile court questioned Mother's failure to live with R.W.W. immediately after K.D.W. was born, rather than returning to Father. Second, the juvenile court disbelieved her testimony regarding the existence of family support, which the record reveals was completely lacking during the pendency of the Agency's emergency temporary custody.

{¶105} Finally, Mother accepted no responsibility for her conduct, choosing instead to blame Father for her illegal drug use. She consistently blamed her lack of transportation for her failure to comply with the case plan, which she also blamed on Father, despite the availability of CARTS and gas cards provided by the Agency. Her lack of accountability does not inspire trust that she will act responsibly in the future.

{¶106} Accordingly, we find the juvenile court did not clearly lose its way and create a manifest miscarriage of justice when it discredited Mother's testimony at the merits hearing. Further, Mother's pre-incarceration conduct likewise supports the juvenile court's conclusion that it is in R.W.'s best interest to be placed in the permanent custody of the Agency. As the juvenile court is vested with credibility determinations and there is competent, credible evidence in the record supporting the juvenile court's conclusion that

Case No. 25 CO 0023

it is in R.W.'s best interest to be in the permanent custody of the Agency, we find Appellant's sole assignment of error is meritless.

## CONCLUSION

{¶107} For the foregoing reasons, the June 10, 2025 judgment entry of the juvenile court terminating Mother's parental rights with respect to R.W. is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 25 CO 0023

———————————————

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Columbiana County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**